**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE HORIZON BANCORP, INC. SECURITIES LITIGATION | **Case No. 1:23-cv-02961**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Chad Key ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for his Amended Complaint (the "Complaint") against Horizon Bancorp, Inc. ("Horizon" or the "Company"), Craig M. Dwight ("Dwight"), and Mark E. Secor ("Secor"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, interviews with former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Horizon securities between February 26, 2021 and March 15, 2023, both dates inclusive (the "Class Period"), seeking

to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are Defendants, former and current officers and directors of Horizon, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, family members, legal representatives, heirs, successors or assigns of any of the above

2.    Throughout the Class Period, Horizon misled investors about its internal control over financial reporting.  Specifically, Defendants concealed that: (i) the Company maintained defective internal accounting and financial disclosure control systems; (ii) reported inflated and inaccurate financial results to investors throughout the Class Period; and (iii) as a result, the Defendants' public statements were materially false and misleading at all relevant times.

3.    Horizon operates as the bank holding company for Horizon Bank, which provides a range of commercial and retail banking services.  Horizon initially focused on operations in Northwest Indiana, but in the past two decades, Horizon has expanded its geographic reach to markets in Southern and Central Michigan and Northeastern and Central Indiana.  In addition to expanding its geographic reach, Horizon has continued to grow its total assets and deposits, so that by December 31, 2022, Horizon had total assets of approximately $7.9 billion and total deposits of approximately $5.9 billion.

4.    Despite this significant growth, Horizon knowingly declined to establish the internal control necessary to provide investors with accurate financial reports.  Specifically, Horizon refused to update its antiquated software and continued to have its financial and accounting staff record financial transactions with Microsoft Excel.  Horizon also understaffed its

financial and accounting operations, while also failing to address known errors flagged by employees.

5.      Horizon's refusal to provide the necessary resources to accurately record its financial dealings caused numerous errors in financial statement disclosures issued from at least February 26, 2021 through November 9, 2022.  These internal control issues, and the errors they produced in Horizon's financial statement disclosures, were known throughout the Company.

6.      Nevertheless, throughout the Class Period, Defendants continued to misleadingly assure investors that Horizon's internal disclosure control and procedures over financial reporting were effective and that the information contained in Horizon's filings with the SEC fairly presented the Company's financial condition and the results of its operations.

7.      On January 25, 2023, after trading hours, Horizon filed a Form 8-K announcing record earnings for the fiscal year 2022, but also admitting that previously issued financial statements for the fiscal year 2021 were inaccurate and that the Company had multiple material weaknesses in its internal control over financial reporting.

8.      In response to this news, Horizon's stock price fell $1.03 per share, or 8.25%, to $14.45, before slightly rebounding to close at $14.69 on January 26, 2023.

9.      On March 10, 2023, after trading hours, Horizon filed a notice of the Company's inability to timely file its Annual Report on Form 10-K for the year ended December 31, 2022 with the SEC, announcing receipt of a notice from NASDAQ as a result of failing to timely file its annual report, as well as disclosing that it had identified material weaknesses in its internal control. Specifically, the material weakness related to:

> (i) accounting revisions of previously issued financial statements with respect to the classification of sold commercial loan participation balances, the reporting of indirect loan dealer reserve asset balances and related amortization expense and the classification of certain available for sale and held to maturity securities from

private labeled mortgage-backed pools to federal agency mortgage pool, which revisions were previously disclosed in the Earnings Release and the Company's Form 10-Q filings during 2022, in addition to errors in previously issued financial statement disclosures relating to the transfer of available for sale to held to maturity securities and the cash flow classification of repurchases of outstanding stock from an investing activity to a financing activity, which will be disclosed for the first time in the 2022 Form 10-K, and (ii) a calculation error in the Company's public float as noted above.

10.     On this news, Horizon's stock price fell $1.62 per share, or 12.41%, to to $11.43, before rebounding slightly to close at $11.62 per share on March 13, 2023.

11.     On March 15, 2023, Horizon filed its Form 10-K for fiscal year 2022, where it disclosed, for the first time, the full breadth of internal control failures that existed at the Company. Specifically, Horizon disclosed that serious material weaknesses existed within the Company's financial reporting that required revisions to financial statements contained in both its 2021 Form 10-K and 2020 Form 10-K.

12.     On the news of Horizon's systemic internal control failures detailed in its 2022 10-K, Horizon's stock price continued its precipitous decline, falling to a low of $10.30 per share, before closing at $11.46 per share on March 15, 2022.

13.     The three-day fallout of these March 2023 disclosures caused Horizon's stock price to drop by $2.75, or 21.07%.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Horizon's most recently filed annual report, as of March 13, 2023, the Company had 43,577,689 shares of common stock outstanding. Horizon's securities trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands of investors in Horizon securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

18.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

19.    Lead Plaintiff Chad Key purchased Horizon securities at artificially inflated prices during the Class Period.  As set forth in his previously-filed certification, Mr. Key was damaged by the conduct alleged herein.

20.    Defendant Horizon is an Indiana corporation with principal executive offices located at 515 Franklin Street, Michigan City, Indiana 46360.  Horizon's common stock trades in an efficient market on the NASDAQ under the ticker symbol "HBNC."

21.    Defendant Craig M. Dwight has served as Horizon's Chief Executive Officer at all relevant times.  As Chief Executive Officer, Dwight had access to, ultimate authority, and oversight over Horizon's internal control systems, and routinely certified filings with the SEC that affirmed that he had reviewed and evaluated Horizon's internal control over financial reporting

and concluded that those internal control systems were effective and produced accurate numbers to investors. Dwight also spoke with authority to investors at Horizon's earnings calls and through Horizon press releases on Horizon's financial health, including the Company's net interest income, throughout the Class Period.

22. Defendant Mark E. Secor has served as Horizon's Chief Financial Officer at all relevant times. As Chief Financial Officer, Secor had input and oversight over Horizon's internal control systems, and routinely certified filings with the SEC that affirmed that he had reviewed and evaluated Horizon's internal control over financial reporting and concluded that those internal control systems were effective and produced accurate numbers to investors. Secor also spoke with authority to investors at Horizon's earnings calls on Horizon's financial health, including the Company's net interest income, throughout the Class Period

23. Defendants Dwight and Secor are sometimes referred to herein collectively as the "Individual Defendants."

24. The Individual Defendants possessed the power and authority to control the contents of Horizon's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Horizon's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Horizon, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.    Horizon and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.    Internal Control Importance and the Internal Control – Integrated Framework (2013) Standard

26.    Internal control is defined as a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance.

27.    The standard that most businesses use to judge their own internal control is the Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission (the "COSO Framework").

28.    The COSO Framework emphasizes that senior management is an important element of internal control.  Specifically, "[s]enior management, which includes the chief executive officer or equivalent organizational leader, is ultimately responsible to the board of directors and other stakeholders for establishing directives, guidance, and control to enable management and other personnel to understand and carry out their responsibilities."  COSO, *Internal Control - Integrated Framework: Executive Summary, Framework and Appendices, and Illustrative Tools for Assessing Effectiveness of a System of Internal Control (3 volume set).* Available from: VitalSource Bookshelf, Association of International Certified Professional Accountants (AICPA), 2019, p. 47.

29.    In particular, the "chief executive officer [is] accountable for understanding the risks faced by the entity and establishing the requisite system of internal control to support the achievement of the entity's objectives.  The chief executive officer and senior management, in turn, are responsible for designing, implementing, conducting, and periodically assessing the

structures, authorities, and responsibilities needed to establish accountability for internal control at all levels of the organization." *Id*. at p. 54.

30.    The COSO Framework also stresses the importance of being able to generate and maintain accurate information, stating that "[m]aintaining quality of information is necessary to an effective internal control system, particularly with today's volume of data and dependence on sophisticated, automated information systems.  The ability to generate quality information begins with the data sourced. Inaccurate or incomplete data, and the information derived from such data, could result in potentially erroneous judgments, estimates, or other management decisions." *Id*. at p. 111.

31.    In order to maintain quality information, the COSO Framework emphasizes how important it is for transactions to be recorded accurately, and how internal control over the input and transmittal of data can be used to ensure accuracy. *Id*. at p. 91.  The reliability of this accuracy is "necessary for the information to faithfully represent the transactions or other events it purports to represent." *Id*. at p. 67.

32.    Internal risk factors to accurate data collection and financial reporting identified by the COSO Framework include the failure to use of capital resources to bolster the infrastructure of an organization, the lack of quality and training of the personnel hired, and a disruption in the information systems processing the financial data. *Id*. at p. 72.

33.    In order to protect against these (and other) internal risk factors, the COSO Framework directs businesses to routinely monitor their internal control systems by performing ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning. *Id*. at p. 123.

34.    Further, to quickly identify and remedy any deficiencies in a company's internal

control and financial reporting, the COSO Framework stresses the need for strong and open communication through the organization regarding any identified deficiencies. *Id*. at p. 134. According to the COSO Framework, "[c]ommunicating internal control deficiencies to the right parties to take corrective actions is critical for entities to achieve objectives." *Id*. This type of communication involves both normal and separate, fail-safe communication channels (such as those for whistleblowers or anonymous communication) across the organization, as well as a clear-cut willingness from management to report and listen for any issues. *Id*. at p. 115. Equally important, "[e]mployees must fully understand how [normal and fail-safe communication channels] operate, how they should be used, and how they will be protected to have the confidence to use them." *Id*.

35.    If a deficiency is found in a company's internal control systems, the COSO Framework instructs businesses to investigate and, if appropriate, take corrective action to remedy the deficiency. *Id*. at p. 102.  "After internal control deficiencies are evaluated and communicated to those parties responsible for taking corrective action, management tracks whether remediation efforts are conducted on a timely basis . . . . As is the case with the initial communication of internal control deficiencies, deficiencies that are not remediated on a timely basis are usually communicated to at least one level of management above the party responsible for taking corrective action. In addition, management may need to revisit the selection and deployment of monitoring activities, including a mix of ongoing and separate evaluations, until corrective actions have remediated the internal control deficiency." *Id*. at p. 135.

36.    Even without a deficiency being identified, the COSO Framework states that businesses should reassess their internal control procedures when significant changes occur that could impact an entity's system of internal control, such as significant acquisitions or rapid growth

that cause operations to expand significantly and quickly, causing existing structures, business processes, information systems, and/or resources to strain to the point where internal control breaks down. *Id*. at p. 85. That is because "[c]hanges in people, process, and technology may reduce the effectiveness of control activities . . . [and thus] management should reassess the relevance of the existing controls and refresh them when necessary." *Id*. at p. 103.

37.     Throughout the Class Period, Horizon assured investors that it adhered to the COSO Framework when judging its internal control over financial reporting, disclosures, and procedures. In the Company's 2020 and 2021 Form 10-K filings, it explicitly asserted that Horizon's analysis of its internal control used the COSO Framework as its guidepost.

**II.     Horizon's History and Recent Rapid Growth**

38.     Horizon operates as the bank holding company for Horizon Bank. Horizon Bank was founded in 1873 as a national association and remained a national association until its conversion into an Indiana commercial bank on June 23, 2017.

39.     Horizon Bank operates as a full-service commercial bank offering commercial and retail banking services, corporate and individual trust and agency services, and other services related to banking.

40.     Horizon is incorporated in Indiana and headquartered in Michigan City, Indiana.

41.     For much of its existence, Horizon Bank operated as a smaller, community bank in Northwest Indiana. However, in the past 20 years, Horizon has broadened its presence from a more community bank in Northwest Indiana to a more regional bank with operations in the Southern, Central, and Great Lakes Bay regions of Michigan, as well as Northeastern and Central Indiana, through a series of expansions and mergers/acquisitions.

42.     Horizon particularly ramped its expansion over the past decade. At the end of

2012, Horizon Bank had total assets of $1.85 billion and total deposits of $1.29 billion. These figures would more than quadruple by the end of the Class Period. For example, in April 2014, Horizon acquired SCB Bancorp, Inc., which allowed Horizon Bank to acquire Summit Community Bank through mergers. Horizon followed up this purchase with the acquisition of Peoples Bancorp and the merger with Peoples Federal Savings Bank of DeKalb County in July 2015.

43.    In 2016, Horizon acquired three separate banks – Farmers State Bank (owned by Kosciuko Financial, Inc.), The LaPorte Savings Bank (owned by LaPorte Bancorp, Inc.), and The Central National Bank and Trust Company (owned by CNB Bancorp) – adding more assets and deposits to its holdings. In February 2017, Horizon continued its acquisition plan, purchasing a branch of First Farmers Bank & Trust Company in Bargersville, Indiana.

44.    In September 2017, Horizon acquired Lafayette Community Bancorp and its wholly-owned subsidiary Lafayette Community Bank, which provided Horizon with four new branches, expanding its branch network to sixty (60) offices throughout Northern and Central Indiana, and Southern Michigan. Shortly thereafter, in October 2017, Horizon completed its acquisition of Wolverine Bancorp, Inc., a Maryland corporation, and Horizon Bank completed its acquisition of Wolverine Bank, a federally-chartered savings bank, through mergers. This acquisition allowed Horizon to increase its loan and deposit base, while also extending its reach into Michigan, including into Midland, Michigan and Troy, Michigan.

45.    In March 2019, Horizon completed yet another acquisition, this time of Salin Bancshares, Inc., which allowed Horizon Bank to acquire Salin Bank and Trust Company, an Indiana commercial bank, through a merger. This acquisition allowed Horizon to increase its loan and deposit base even further, while also extending Horizon's reach into Central Indiana,

including Indianapolis and Columbus, and Northeastern Indiana, including Fort Wayne.

46.     In September 2021, Horizon completed its acquisition of fourteen (14) branches and associated deposits and loans from TCF National Bank (now The Huntington National Bank). This acquisition not only represented Horizon Bank's fifteenth acquisition since 2002 and fifth acquisition in the previous five years, but also expanded its branch network to seventy-one (71) offices.  By December 31, 2022, the Company had total assets of $7.9 billion and total deposits of $5.9 billion.

### III.    Horizon's Systems Were Outdated and Maintained Defective Internal Control Systems in Violation of the COSO Framework

47.     Despite Horizon's rapid expansion, it continued to use antiquated software to record financial transactions and understaff its accounting and financial reporting divisions.  In contradiction to its repeated assurances to investors that its internal control systems met the standards set forth in the COSO Framework, Horizon failed to upgrade its software, training, and staffing in the face of rapid growth and significant acquisitions, failed to provide for open lines of communication for employees to relay identified deficiencies, and failed to investigate and remediate already-identified deficiencies in Horizon's internal control systems, creating material weaknesses that compromised its financial reporting and undermined the accuracy of the financial statements published to investors.

48.     Beginning in April 2014, Horizon employed Confidential Witness 1 ("CW1") as the President of the Greater Lansing, Michigan market for Horizon until 2022.  CW1 initially founded a bank in Lansing which Horizon purchased in 2014.  CW1's main responsibilities as president of the Greater Lansing market for Horizon were to attract and maintain business for the commercial and retail aspects of the Greater Lansing market for Horizon.

49.     Beginning in November 2019, Horizon employed Confidential Witness 2 ("CW2")

as a Mortgage Loan Officer at the Holland, Michigan branch of Horizon until April 2023. CW2's main responsibilities focused on selling mortgages and home equity loans to customers, as well as selling loans for vehicles and unsecured personal loans.

50.     Beginning in April 2019, Horizon employed Confidential Witness 3 ("CW3") as a Business Banker and Manager at the Holland, Michigan branch of Horizon until July 2022. CW3 handled operational activities for the Holland branch, as well as attracted customers for small business loans.

51.     Beginning in November 2017, Horizon employed Confidential Witness 4 ("CW4") as a Benefit Specialist for Horizon until August 2021. CW4 was based at Horizon's corporate headquarters in Michigan City, Indiana. CW4's main responsibilities were to assist Horizon employees, often from banks recently acquired by Horizon, in enrolling in and accessing company benefits.

52.     Beginning in October 2017, Horizon employed Confidential Witness 5 ("CW5") as a Commercial Credit Analyst for Horizon until March 2022. CW5's main responsibilities involved reviewing a borrower's financial profile in order to help Horizon determine whether or not to issue a loan.

53.     Despite Horizon's rapid growth through the acquisition of smaller banks and financial institutions, the Company did not change the way it was managing its financial accounting and reports, and continued to use Excel spreadsheets to manage the Company's financials. According to CW1, despite the flurry of acquisitions in the past decade that dramatically increased Horizon's assets, the Company continued to use Excel and refused to bulk up its staff and operations.

54.     CW2 affirmed that Horizon used antiquated software to record loans and branch

operations, such as deposits, account transactions, and account changes. CW2 explained that the software was the same that CW2 used in lending 25 years ago and was old and very challenging. CW3 confirmed that the general sentiment among Horizon employees was that the software was antiquated and that even though Horizon was a big bank, they operated like they were in the early 2000s. According to CW5, the software employed by Horizon was very dated compared to other banks and was very cumbersome to use.

55.     CW4 dealt with many new employees who arrived from banks acquired by Horizon and reported that the general sentiment among those employees was surprise at the outdated nature of Horizon's systems. CW4 noted that some acquired employees directly asked CW4 why Horizon was taking two steps back on technology.

56.     The use of Excel to manage Horizon's financial data such as deposits, loans, and net interest, rather than more sophisticated integrated financial software, caused numerous mistakes in the financial reports that were created. CW1 affirmed that almost every month, CW1 had to check numbers that did not look correct and several times saw inaccurate figures. While CW1 scrutinized his branch's market reports and attempted to catch as many errors as possible, CW1 could not guarantee other presidents did the same, leaving errors to go unnoticed and uncorrected. CW1 stated that the errors in Horizon's internal financial reporting were more common than not.

57.     According to CW1, these errors were not just limited to the Greater Lansing market, but instead occurred in numerous Horizon markets. Horizon would have quarterly meetings in Michigan City, Indiana (and later via Zoom after 2020), and CW1 would speak to regional presidents of other Horizon markets, like Detroit and Kalamazoo, and CW1 was told that they were experiencing the same errors. CW1 did not understand why Horizon did not invest in

a more robust financial management and reporting software system.

58.     According to CW2, the internal control systems were so defective that Horizon headquarters would routinely send out loan reports to branches with significant errors that would need to be corrected.  CW2 confirmed that over the course of a year, half of the time the loan reports were incorrect.  These errors were typically due to entire loans being left off of reports. CW2 corroborated that Horizon's internal control for financial reporting was an antiquated process that did not match the amount of assets that Horizon had under control.

59.     CW3 confirmed that Horizon sent a monthly report to its branches that regularly had errors requiring correction related to the value of deposits or the total value of loans. Moreover, despite the routine nature of these errors, CW3 affirmed that Horizon did not have a formal process for alerting the Company of these errors.

60.     Further, according to CW1, the Company severely understaffed the finance department of the bank, with only two to three people plus Secor in the entire department.  This resulted in one employee – the Vice President of Financial Analysis – having to manage all of the Excel spreadsheets from every Horizon branch that were rolled into the Company's reported financials.  CW1 explained that Horizon's refusal to upgrade its software or add staff in the midst of its rapid expansion and acquisitions resulted in Horizon employees having to handle an increasing workload.  This lack of staff and reliance on unwieldy Excel spreadsheets made financial management more difficult, resulting in errors in almost everything from loan servicing to the financials.  For example, CW1 received a monthly report of the value of Horizon deposits versus the value of Horizon loans outstanding, and each month there would be a substantial, almost unrealistic, shift in the numbers, indicating errors in Horizon's financial reporting.

61.     CW1 regularly discussed these issues with Horizon management, including a Vice

President of Financial Analysis and Reporting who reported to Secor, who acknowledged the issues but did nothing to address the lack of staff or Excel spreadsheet issue. According to CW1, Horizon management was stubborn and refused to follow advice from experienced bankers to upgrade the Company's internal control systems. Like CW1, CW2 brought these concerns up routinely with Horizon management, who CW2 indicated were fully aware of the consistent errors in financial reports being created by Horizon.

62.     Despite being aware of the significant flaws in its internal control for financial reporting, Horizon dismissed any requests for upgrades because they were cost prohibitive. According to CW2, Horizon employees consistently complained about the use of this software and requested an upgrade, but Horizon leadership responded that upgrades were too expensive. This was echoed by CW4, who heard from Horizon employees that every time they requested upgrades to the Company's internal control, such as Horizon's banking software systems, Horizon management cited the expense as the reason for its refusal.

63.     Horizon's refusal to upgrade its software systems, properly staff its financial and accounting departments, adopt sound internal control for financial reporting, and address known deficiencies in their internal control systems would eventually lead to the material weaknesses compromising its financial reporting throughout the Class Period.

**IV.    Defendants Make Materially False and Misleading Statements During the Class Period**

64.     Throughout the Class Period, despite the significant flaws and deficiencies in Horizon's internal control systems that produced numerous errors in the Company's financial reporting, Defendants consistently and misleadingly assured investors that Horizon's internal control systems were effective and adhered to the standards set forth in the COSO Framework.

65.     The Class Period begins on February 26, 2021, Horizon filed its Annual Report on

Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K reiterated the Company's January 27, 2021 press release touting Horizon's record year, including a net interest income of approximately $170 million.

66.    However, these numbers, including the $170 million in net interest income, were false due to the material weaknesses and defective internal control in Horizon's financial reporting, and would later be revised downward by more than $5 million in 2023.

67.    The 2020 10-K stated, in relevant part[1]:

Management is responsible for the preparation and presentation of the consolidated financial statements and related notes on the preceding pages. The statements have been prepared in conformity with accounting principles generally accepted in the United States of America appropriate in the circumstances and include amounts that are based on management's best estimates and judgments. Financial information elsewhere in the Annual Report is consistent with that in the consolidated financial statements.

***In meeting its responsibility for the accuracy of the consolidated financial statements, management relies on Horizon's system of internal accounting controls. This system is designed to provide reasonable assurance that assets are safeguarded and transactions are properly recorded to permit the preparation of appropriate financial information***. The system of internal controls is supplemented by a program of internal audits to independently evaluate the adequacy and application of financial and operating controls and compliance with Company policies and procedures.

68.    Further, with respect to the Company's disclosure control and procedures, the 2020 10-K stated, in relevant part:

**Disclosure Controls and Procedures**

Under the supervision of and with the participation of its management, including the Chief Executive Officer and Chief Financial Officer, Horizon has evaluated the effectiveness of the design and operation of its disclosure controls (as defined in Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")) as of the end of the period covered by this report. ***Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure***

---

[1] Except where otherwise noted, all emphasis is supplied.

> *controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure.*

**Management's Report on Internal Control Over Financial Reporting**

Management of Horizon is responsible for establishing and maintaining effective internal control over financial reporting as defined in Rule 13a–15(f) under the Securities Exchange Act of 1934. Horizon's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

> *Management assessed the effectiveness of Horizon's internal control over financial reporting as of December 31, 2020. In making this assessment, management used the criteria set forth in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission. Based on this assessment, management has determined that Horizon's internal control over financial reporting as of December 31, 2020 is effective based on the specified criteria.*

69.     Appended to the 2020 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2020 10-K] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

70.     The statements identified in Paragraphs 67-69 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over

financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2020 10-K to be unreliable and false.

71.     On April 30, 2021, Horizon filed its Form 10-Q with the SEC, reporting the Company's financial and operational results for the first quarter of 2021, ending on March 31, 2021 ("2021 Q1 10-Q").  The 2021 Q1 10-Q stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation of disclosure controls and procedures as of March 31, 2021, Horizon's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of Horizon's disclosure controls (as defined in Exchange Act Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). ***Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files under the Exchange Act is recorded, processed, summarized and reported within the time specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure***.

**Changes in Internal Control Over Financial Reporting**

***Horizon's management, including its Chief Executive Officer and Chief Financial Officer, also have concluded that during the fiscal quarter ended March 31, 2021, there have been no changes in Horizon's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Horizon's internal control over financial reporting***.

72.     Appended to the 2021 Q1 10-Q as exhibits were signed certifications pursuant to SOX by Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2021 Q1 10-Q] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

73.      The statements identified in Paragraphs 71-72 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2021 Q1 10-Q to be unreliable and false.

74.      On July 27, 2021, Horizon issued a press release touting its strong second quarter in 2021, including "stable net interest income" and "investing savings into digital capabilities", and quoted Dwight, stating:

> *Horizon achieved strong earnings in the second quarter, along with increased non–interest income, stable net interest income, lower deposit costs and strong asset quality metrics*[.] With an improving commercial lending pipeline, and ample liquidity and capital, Horizon is very well positioned for loan growth more in line with historic levels in a recovering economy. We also continue to focus on disciplined management of our highly efficient operations and initiated plans to consolidate 10 locations this summer, reassigning employees to other open positions and investing savings into digital capabilities and opportunities in our growing Indiana and Michigan markets. *We also announced the acquisition of 14 Michigan branches to extend our low–cost deposit franchise in a financially and strategically attractive transaction that is on schedule for completion during the third quarter*.

75.      The statements identified in Paragraph 74 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal

accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) the statements omitted that Horizon's internal control over financial reporting was not effective; (d) the statements omitted that Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the figures underlying Dwight's statement were unreliable; and (f) the statements omitted that despite acquiring 14 Michigan branches, the Company refused to upgrade its staffing and financial reporting capabilities to handle the increased assets under Horizon's control.

76.    On August 3, 2021, Horizon filed its Form 10-Q with the SEC, reporting the Company's financial and operational results for the second quarter of 2021, ending on June 30, 2021 ("2021 Q2 10-Q"). The 2021 Q2 10-Q stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation of disclosure controls and procedures as of June 30, 2021, Horizon's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of Horizon's disclosure controls (as defined in Exchange Act Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). ***Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files under the Exchange Act is recorded, processed, summarized and reported within the time specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure***.

**Changes in Internal Control Over Financial Reporting**

***Horizon's management, including its Chief Executive Officer and Chief***

*Financial Officer, also have concluded that during the fiscal quarter ended June 30, 2021, there have been no changes in Horizon's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Horizon's internal control over financial reporting.*

77.    Appended to the 2021 Q2 10-Q as exhibits were signed certifications pursuant to SOX by Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2021 Q2 10-Q] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

78.    The statements identified in Paragraphs 76-77 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2021 Q2 10-Q to be unreliable and false.

79.    On October 27, 2021, in advance of its 10-Q for the Company's third quarter of 2021, Horizon issued a press release touting "record profitability," including "record net interest income."  The October 27, 2021 press release quoted Dwight stating:

*Organic commercial and consumer loan growth, the extension of Horizon's Michigan franchise with our branch acquisition completed last month, record net interest income, Horizon's low–cost deposit franchise, and our efficient*

***operations all contributed to significant growth in pre–tax, pre–provision net income and bottom–line earnings***[.] We continue to conservatively manage our balance sheet while generating meaningful returns on excess liquidity, and we remain well positioned for more significant loan growth in our attractive and business–friendly Midwestern markets, which are seeing significant economic activity and favorable trends in a still–recovering economy.

80.     The statements identified in Paragraph 79 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) the statements omitted that Horizon's internal control over financial reporting was not effective; (d) the statements omitted that Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; and (e) as a result, the figures underlying Dwight's statement were unreliable.

81.     On November 8, 2021, Horizon filed its Form 10-Q with the SEC, reporting the Company's financial and operational results for the third quarter of 2021, ending on September 30, 2021 ("2021 Q3 10-Q").  The 2021 Q3 10-Q stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation of disclosure controls and procedures as of September 30, 2021, Horizon's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of Horizon's disclosure controls (as defined in Exchange Act Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). Based on such evaluation, such officers have concluded that, as of the evaluation date, ***Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files under the Exchange Act is recorded, processed, summarized and reported within the time specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure***.

23

**Changes in Internal Control Over Financial Reporting**

*Horizon's management, including its Chief Executive Officer and Chief Financial Officer, also have concluded that during the fiscal quarter ended September 30, 2021, there have been no changes in Horizon's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Horizon's internal control over financial reporting.*

82.     Appended to the 2021 Q3 10-Q as exhibits were signed certifications pursuant to SOX by Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2021 Q3 10-Q] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

83.     The statements identified in Paragraphs 81-82 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2021 Q3 10-Q to be unreliable and false.

84.     On January 26, 2022, Horizon issued a press release touting the record earnings that it obtained in 2021, including record net interest income, and quoted Dwight, stating:

Horizon capped 2021 with record annual earnings and net interest income, as well as continued growth in commercial and consumer loans through the fourth quarter, mortgage production well in–line with our expectations, strong asset quality metrics and continued disciplined expense management.

85.    The statements identified in Paragraph 84 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) the statements omitted that Horizon's internal control over financial reporting was not effective; (d) the statements omitted that Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; and (e) as a result, the "record net interest income" that Dwight describes was actually lower than reported and the figures underlying Dwight's statement were unreliable and false.

86.    On March 9, 2022, Horizon filed its Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K reiterated the record earnings, including a net interest income of approximately $181 million.

87.    However, these numbers, including the $181 million in net interest income, were false due to the material weaknesses and defective internal control systems in Horizon's financial reporting, and would later be revised downward by more than $5 million in 2023.

88.    The 2021 10-K stated, in relevant part:

Management is responsible for the preparation and presentation of the consolidated

financial statements and related notes on the preceding pages. The statements have been prepared in conformity with accounting principles generally accepted in the United States of America appropriate in the circumstances and include amounts that are based on management's best estimates and judgments. Financial information elsewhere in the Annual Report is consistent with that in the consolidated financial statements.

***In meeting its responsibility for the accuracy of the consolidated financial statements, management relies on Horizon's system of internal accounting controls. This system is designed to provide reasonable assurance that assets are safeguarded and transactions are properly recorded to permit the preparation of appropriate financial information***. The system of internal controls is supplemented by a program of internal audits to independently evaluate the adequacy and application of financial and operating controls and compliance with Company policies and procedures.

89.    Further, with respect to the Company's disclosure control and procedures, the 2021

10-K stated, in relevant part:

**Disclosure Controls and Procedures**

Under the supervision of and with the participation of its management, including the Chief Executive Officer and Chief Financial Officer, Horizon has evaluated the effectiveness of the design and operation of its disclosure controls (as defined in Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")) as of the end of the period covered by this report. ***Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure***.

**Management's Report on Internal Control Over Financial Reporting**

Management of Horizon is responsible for establishing and maintaining effective internal control over financial reporting as defined in Rule 13a–15(f) under the Securities Exchange Act of 1934. Horizon's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of published financial statements.

***Management assessed the effectiveness of Horizon's internal control over***

26

*financial reporting as of December 31, 2021. In making this assessment, management used the criteria set forth in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission. Based on this assessment, management has determined that Horizon's internal control over financial reporting as of December 31, 2021 is effective based on the specified criteria*.

90.    Appended to the 2021 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2021 10-K] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

91.    The statements identified in Paragraphs 88-90 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2021 10-K to be unreliable and false.

92.    On May 5, 2022, Horizon filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2022 (the "2022 Q1 10-Q").   With respect to the Company's disclosure control and procedures, the 2022 Q1 10-Q stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation of disclosure controls and procedures as of March 31, 2022, Horizon's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of Horizon's disclosure controls (as defined in Exchange Act Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). *Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files under the Exchange Act is recorded, processed, summarized and reported within the time specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure*.

**Changes in Internal Control Over Financial Reporting**

*Horizon's management, including its Chief Executive Officer and Chief Financial Officer, also have concluded that during the fiscal quarter ended March 31, 2022, there have been no changes in Horizon's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Horizon's internal control over financial reporting.*

93.     Appended to the 2022 Q1 10-Q as exhibits were signed certifications pursuant to SOX by the Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2022 Q1 10-Q] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

94.     The statements identified in Paragraphs 92-93 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over

financial reporting was not effective; (d) Horizon's internal control over financial reporting did

not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly

present in all material respects the financial condition, results of operations, and cash flows" of

the Company; and (f) the statements omitted that the material weaknesses caused the numbers in

the 2022 Q1 10-Q to be unreliable and false.

95.     On August 8, 2022, Horizon filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operational results for the quarter ended June 30, 2022 (the

"2022 Q2 10-Q").  With respect to the Company's disclosure control and procedures, the 2022 Q2

10-Q stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation of disclosure controls and procedures as of June 30, 2022, Horizon's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of Horizon's disclosure controls (as defined in Exchange Act Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). ***Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files under the Exchange Act is recorded, processed, summarized and reported within the time specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure***.

**Changes in Internal Control Over Financial Reporting**

***Horizon's management, including its Chief Executive Officer and Chief Financial Officer, also have concluded that during the fiscal quarter ended June 30, 2022, there have been no changes in Horizon's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Horizon's internal control over financial reporting.***

96.     Appended to the 2022 Q2 10-Q as exhibits were signed certifications pursuant to

SOX by the Individual Defendants, attesting that the "financial statements, and other financial

information included in [the 2022 Q2 10-Q] fairly present in all material respects the financial

condition, results of operations, and cash flows" of the Company.

97.     The statements identified in Paragraphs 95-96 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2022 Q2 10-Q to be unreliable and false.

98.     On November 9, 2022, Horizon filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2022 (the "2022 Q3 10-Q"). With respect to the Company's disclosure control and procedures, the 2022 Q3 10-Q stated, in relevant part:

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation of disclosure controls and procedures as of September 30, 2022, Horizon's Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of Horizon's disclosure controls (as defined in Exchange Act Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")). ***Based on such evaluation, such officers have concluded that, as of the evaluation date, Horizon's disclosure controls and procedures are effective to ensure that the information required to be disclosed by Horizon in the reports it files under the Exchange Act is recorded, processed, summarized and reported within the time specified in Securities and Exchange Commission rules and forms and are designed to ensure that information required to be disclosed***

*in those reports is accumulated and communicated to management as appropriate to allow timely decisions regarding disclosure.*

**Changes in Internal Control Over Financial Reporting**

*Horizon's management, including its Chief Executive Officer and Chief Financial Officer, also have concluded that during the fiscal quarter ended September 30, 2022, there have been no changes in Horizon's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Horizon's internal control over financial reporting.*

99.     Appended to the 2022 Q3 10-Q as exhibits were signed certifications pursuant to SOX by the Individual Defendants, attesting that the "financial statements, and other financial information included in [the 2022 Q3 10-Q] fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company.

100.    The statements identified in Paragraphs 98-99 were materially false and misleading when made because (a) the statements omitted that Horizon maintained defective internal accounting and financial reporting control relating to, and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) the statements omitted to disclose that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) Horizon's internal control over financial reporting was not effective; (d) Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, the filing did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company; and (f) the statements omitted that the material weaknesses caused the numbers in the 2022 Q3 10-Q to be unreliable.

**V.      The Truth Emerges Through a Series of Disclosures**

101.    On January 25, 2023, after the market closed, Horizon filed a Form 8-K which

announced its unaudited financial results for the three and twelve months ending on December 31, 2022. In its Form 8-K, Horizon announced "record annual earnings." However, buried beneath the good financial news was the first indication of Horizon's defective internal control systems, as Horizon announced that:

> An accounting revision was made to amounts reported in previously issued financial statements covering the third quarter of 2022 related to immaterial errors discovered in the fourth quarter of 2022. The errors relate to the inclusion of the dealer reserve amortization expense in loan expense in non–interest expenses for the third quarter of 2022 rather than loan interest income. The previously issued financial statements for the three and nine months dated September 30, 2022 have been revised to correct this error, which resulted in lowering both interest income and non–interest expense by $1.5 million for the quarter and lowering net interest margin by ten basis points from the historical presentation of these amounts[.]

102.    Horizon provided a revision to the figures provided for the three and twelve months ending on December 31, 2021, showing, among other things, a reduction of approximately $5,885,000 in interest income and a reduction of 0.17% in the average rate on loans (all figures other than percentages in thousands of U.S. dollars):

| | Twelve Months Ended | | | | | |
| | December 31, 2022 | | | December 31, 2021 | | |
| | Without Dealer Reserve Change | Dealer Reserve Change | Actual | Pre Revision | Revision | Post Revision |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Loans, net of allowance for credit losses | $ 4,089,370 | $ 18,164 | $ 4,107,534 | $ 3,590,331 | $ 13,917 | $ 3,604,248 |
| Other assets | 157,445 | (18,164) | 139,281 | 80,753 | (13,917) | 66,836 |
| Total assets | 7,872,518 | — | 7,872,518 | 7,411,889 | — | 7,411,889 |
| **Income Statement** | | | | | | |
| Interest income | 241,895 | (5,862) | 236,033 | 199,995 | (5,885) | 194,110 |
| Net interest income | 205,380 | (5,862) | 199,518 | 181,690 | (5,885) | 175,805 |
| Non–interest expense | 149,063 | (5,862) | 143,201 | 139,279 | (5,885) | 133,394 |
| Net income | 93,408 | — | 93,408 | 87,091 | — | 87,091 |
| **Average Balance Sheet** | | | | | | |
| Loans | 3,828,090 | 17,047 | 3,845,137 | 3,626,033 | 13,421 | 3,639,454 |
| Interest earning assets | 6,960,360 | 17,047 | 6,977,407 | 6,021,740 | 13,421 | 6,035,161 |
| Other assets | 526,276 | (17,047) | 509,229 | 459,316 | (13,421) | 445,895 |
| Total assets | $ 7,533,915 | $ — | $ 7,533,915 | $ 6,514,251 | | $ 6,514,251 |
| **Other Financial Information** | | | | | | |
| Average rate on loans | 4.70 % | (0.17) % | 4.53% | 4.47 % | (0.17) % | 4.30 % |
| Average rate on interest earning assets | 3.60 | (0.10) | 3.50 | 3.43 | (0.10) | 3.33 |
| Net interest spread | 2.93 | (0.10) | 2.83 | 3.03 | (0.10) | 2.93 |
| Net interest margin | 3.07 | (0.09) | 2.98 | 3.13 | (0.10) | 3.03 |
| Efficiency ratio | 58.96 | (0.98) | 57.98 | 58.12 | (1.05) | 57.07 |
| Non–interest expense to average assets | 1.98 % | (0.08) % | 1.90% | 2.14 % | (0.09) % | 2.05 % |

103.    As a result of these partial disclosures, Horizon's stock price fell $1.03 per share, or 8.25%, to $14.45, before slightly rebounding to close at $14.69 on January 26, 2023.

104.    Notably, Horizon's January 25, 2023 8-K did not reveal the full scope of the deficiencies in the Company's internal control systems, or the deficiencies' impact on previously issued financial statements, as that would come later.  By failing to disclose the full truth about

the internal control failures at Horizon over the past two years, Defendants stemmed the full decline that would otherwise occur in Horizon's stock price.

105.    On March 10, 2023, Horizon's stock price closed at $13.05 per share. After trading hours, Horizon filed a notice of the Company's inability to timely file its Annual Report on Form 10-K for the year ended December 31, 2022 with the SEC.  The notice stated, in relevant part:

> On March 6, 2023, Horizon [. . .] received a letter (the "Letter") from [the NASDAQ] indicating that, as a result of not having timely filed its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K") by March 1, 2023 with the [SEC], the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1), which requires timely filing of all required periodic financial reports with the SEC.
>
> Prior to receiving the Letter from NASDAQ, the Company believed it qualified as an "accelerated filer," as defined in Rule 12b-2 under the [Exchange Act], and therefore, the deadline for filing its 2022 Form 10-K was March 16, 2023. As a result, the Company planned to file its 2022 Form 10-K prior to such deadline. However, the Company has now concluded that it made a calculation error in computing its public float and that it instead qualifies as a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act for purposes of its 2022 Form 10-K. As a result, the filing deadline for the Company's 2022 Form 10-K was March 1, 2023.
>
> The Company furnished as Exhibit 99.1 to its Form 8-K filed January 25, 2023, a press release (the "Earnings Release") disclosing the Company's preliminary and unaudited results for the three and twelve months ended December 31, 2022.
>
> In addition, the Company has identified material weaknesses in the Company's internal controls over financial reporting relating to: (i) accounting revisions of previously issued financial statements with respect to the classification of sold commercial loan participation balances, the reporting of indirect loan dealer reserve asset balances and related amortization expense and the classification of certain available for sale and held to maturity securities from private labeled mortgage-backed pools to federal agency mortgage pool, which revisions were previously disclosed in the Earnings Release and the Company's Form 10-Q filings during 2022, in addition to errors in previously issued financial statement disclosures relating to the transfer of available for sale to held to maturity securities and the cash flow classification of repurchases of outstanding stock from an investing activity to a financing activity, which will be disclosed for the first time in the 2022 Form 10-K, and (ii) a calculation error in the Company's public float as noted above. The Company has already addressed (or expects that, by the filing of the 2022 Form 10-K, it will have addressed) all of these material weaknesses, and they

will be further discussed in the 2022 Form 10-K.

The Company does not expect to report any material changes to its financial results previously reported in the Earnings Release.

The Company is working diligently with its auditors to finalize the audit and the 2022 Form 10-K and intends to file its 2022 Form 10-K as soon as possible.

106.    On this news, Horizon's stock price fell $1.62 per share, or 12.41%, to $11.43 before rebounding slightly to close at $11.62 per share on March 13, 2023.

107.    On March 15, 2023, Horizon finally filed its 2022 10-K.  In the 2022 10-K, Horizon expounded on its internal control failures.  Specifically, Horizon revealed that its accounting firm, FORVIS, LLP ("FORVIS"), had audited Horizon and determined that "the company has not maintained effective internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control – Integrated Framework: (2013) issued by the COSO."  FORVIS identified two material weaknesses in Horizon's internal control: (1) "[i]nsufficient controls over the reporting, classification and disclosure of loans, investments and individual cash flow line items[;]" and (2) "[l]ack of sufficient controls around the financial reporting process that allowed for the timely release of financial statements."

108.    Horizon's 2022 10-K also revealed that, when discussing Horizon's disclosure control and procedures:

Horizon has evaluated the effectiveness of the design and operation of its disclosure controls (as defined in Rule 13a–15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")) as of the end of the period covered by this report.  Based on such evaluation, such officers have concluded that, as of the evaluation date, ***due to the material weaknesses in the Company's internal control over financial reporting described below, the Company's disclosure controls and procedures were not effective as of December 31, 2022***.

109.    When addressing Horizon's internal control over financial reporting, the Company determined that, based on the criteria set forth in the COSO Framework:

[M]anagement has concluded that *the Company's internal control over financial reporting was not effective as of that date because of the material weaknesses in internal control over financial reporting described below*. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. In this regard, *management identified material weaknesses with respect to insufficient controls over the reporting, classification, and disclosure of loans, investments and individual cash flow line items and lack of sufficient controls around the financial reporting process that allows for the timely release of financial statements*[.]

110.    According to Horizon, these material weaknesses in the Company's internal control over financial reporting resulted in errors in:

> previously issued financial statements with respect to the classification of sold commercial loan participation balances, the reporting of indirect loan dealer reserve asset balances and related amortization expense and the classification of certain available for sale and held to maturity securities from private labeled mortgage-backed pools to federal agency mortgage pool, which revisions were previously disclosed in the press release in the Company's Form 8–K filed January 25, 2023 (the "Earnings Release") and the Company's Form 10–Q filings during 2022, in addition to errors in previously issued financial statement disclosures relating to the transfer of available for sale to held to maturity securities and the cash flow classification of repurchases of outstanding stock from an investing activity to a financing activity, which are being disclosed for the first time in this Annual Report on Form 10–K, and a calculation error in the Company's public float[.]

111.    These errors, as Horizon admitted, rendered false information in its financial reports going as far back as its 2020 10-K.  The revisions lowered interest income by $5.9 million in 2021 and $5.4 million in 2020.  The revisions also lowered net interest margin by ten basis points in 2021 and eleven basis points in 2020.

112.    Further, Horizon stated that, "[p]rincipal factors contributing to the identification of this material weakness included lack of sufficient resources and training in our accounting and finance department, insufficient procedures for the preparation of financial statement disclosures and insufficient procedures for the documentation and review for financial statement disclosures."

113.    On the news of Horizon's systemic internal control failures detailed in its 2022 10-

K, Horizon's stock price continued its precipitous decline, falling to a low of $10.30 per share, before closing at $11.46 per share on March 15, 2022.

114.    Ultimately, the three-day fallout of these disclosures caused Horizon's stock price to drop by $2.75, or 21.07%.

115.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VI.    Additional Allegations of Scienter

### A.    Defendants Received Actual Notice Of Errors In Financial Reporting

116.    Defendants admitted in Form 10-Q's filed on May 5, 2022, August 8, 2022, November 9, 2022, May 10, 2023, and August 8, 2023 that their previously-issued financial statements had inaccuracies, although they downplayed those inaccuracies by not describing the full extent of the problem, and by falsely telling investors that there were no material weaknesses and that the reporting controls were then effective.

117.    Having received actual notice of errors in their financial reporting, Defendants either: (1) investigated the errors and knowingly falsely reported that internal control deficiencies had been remediated and that the financial results were as stated; or (2) were reckless in reporting to investors that the Company's internal control over financial reporting was sound without informing themselves of their actual status, and that the financial results had been inflated.

### B.    Defendants Knew Or Ignored That Horizon Violated The COSO Framework They Told Investors The Company Followed

118.    Defendants' scienter is supported by the fact that Horizon's actions with respect to internal control diverged greatly from the principles set forth in the COSO Framework that Horizon professed to follow.

119.    Throughout the Class Period, Defendants avowed that Horizon and Individual Defendants "assessed the effectiveness of Horizon's internal control over financial reporting" and, in making this assessment, "used the criteria set forth in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission" and that "[b]ased on this assessment," Defendants determined that Horizon's internal control were "effective based on the specified criteria." *See* Paragraphs 68, 89.

120.    Despite these assurances, Defendants' actions throughout the Class Period were in direct contradiction to the practices specified by the COSO Framework.

121.    The COSO Framework instructs businesses to reassess their internal control procedures when significant changes occur that could impact an entity's system of internal control, such as significant acquisitions or rapid growth.  Throughout the 2010s and into the 2020s, Horizon acquired numerous banks and rapidly grew its business from $1.85 billion in assets and $1.29 billion in deposits to $7.9 billion in assets and $5.9 billion in deposits.  However, Horizon never adjusted its internal control systems in response to this rapid growth.  Instead, according to CW1, due to the expense at upgrading its internal control systems, Horizon continued to use antiquated software and understaff its financial and accounting departments.

122.    The COSO Framework also instructs businesses to keep open formal and informal lines of communication so that employees can report internal control deficiencies.  However, according to CW3, Horizon did not have a formal process to report internal control deficiencies to management, even though Horizon routinely sent error-ridden monthly reports to its branches.

123.    The COSO Framework instructs businesses to properly investigate and remedy any internal control deficiency, with management tracking whether remediation efforts are conducted on a timely basis.  According to CW1 and CW2, internal control deficiencies were routinely

reported to Horizon management – including executives who reported directly to Secor – and the deficiencies were never addressed.

124.    Finally, the COSO Framework instructs businesses that internal risk factors such as the failure to use capital resources to bolster operations and infrastructure, technology disruptions, and the lack of quality personnel and training can lead to internal control deficiencies.  Not only did the CWs affirm that Defendants refused to put forth the necessary resources to address these issues, but Horizon's post-Class Period actions, including hiring additional staff and upgrading their financial statement procedures, also demonstrate that during the Class Period, Defendants eschewed the COSO Framework's guidance.

125.    Horizon's wanton disregard for the practices that Defendants explicitly told investors they followed demonstrates that Defendants either knew, or recklessly disregarded, that their repeated commitments to the COSO Framework were materially misleading and the rest of their misleading statements about the effectiveness of Horizon's internal control systems throughout the Class Period misled investors.

###    C.    That Defendants Held Themselves Out As Knowledgeable Bolsters Scienter

126.    Defendants' own statements show that they repeatedly held themselves out as extremely knowledgeable about the financial statements that would later need to be revised due to the internal control failures at the Company.

127.    In earnings calls with investors and press releases, Dwight and Secor repeatedly spoke about Horizon's financial status, including Horizon's net interest income.  For example, on January 26, 2022, right before Horizon put out its 2021 10-K, Dwight was quoted in a press release discussing Horizon's net interest income, which would later be revised downward after it was revealed that Horizon's internal control was defective and provided inaccurate financial

reporting, stating, "Horizon capped 2021 with record annual earnings and net interest income, as well as continued growth in commercial and consumer loans through the fourth quarter, mortgage production well in–line with our expectations, strong asset quality metrics and continued disciplined expense management."

128.    Similarly, on July 28, 2021, in advance of the 2021 Q2 10-Q being filed, Secor spoke about Horizon's success, including its increase in net interest income, numbers that would later be revised downward after it was revealed that Horizon's internal control was defective and provided inaccurate financial reporting, stating, "Horizon saw a record net income for the second quarter, with increases in both net interest income and non-interest income over the first quarter … net interest income increased with a higher level of interest turning assets with the move of assets from cash to the investment portfolio."

129.    Only two inferences are plausible: that Defendants actually possessed the knowledge they claimed to have with respect to the accuracy of Horizon's financial reporting, and therefore knew the truth they concealed from investors, or Defendants, despite holding themselves out as knowledgeable, recklessly chose not to inform themselves of the truth and made no attempt to avoid misleading investors.

**D.    That Individual Defendants Certified Horizon's Filing To Investors Bolsters Scienter**

130.    Defendants Dwight and Secor's actual knowledge of the falsity of the alleged misstatements and omissions is also established by their signing of certification in connection with Horizon's filing of its Form 10-Qs and Form 10-Ks with the SEC.  These certifications certified, among other things, that the filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the

filings]" and that the filings "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the filings]."

131.    Moreover, Defendants Dwight and Secor explicitly certified that, "based on [their] most recent evaluation of internal controls over financial reporting[,]" they disclosed, "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

132.    If Individual Defendants Dwight and Secor had, in fact, made that assessment (which they told investors eight times during the Class Period they had done), then they were aware of the actual state of Horizon's internal controls and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

**E.    That Individual Defendants Are Horizon's Senior Executives Bolsters Scienter**

133.    That Dwight and Secor were Horizon's most senior executives and on its management team further supports an inference of scienter.  Dwight and Secor knew facts and had access to information suggesting that their public statements were not accurate or failed to check the information they had a duty to monitor.

**F.    That Defendants Had Access To Information Contradicting Their Public Statements Bolsters Scienter**

134.    As set forth above, Individual Defendants routinely certified that they evaluated Horizon's internal control over financial reporting and knew all significant deficiencies and material weaknesses within the Company.  *See* Paragraphs 69, 72, 77, 82, 90, 93, 96, 99. Therefore, by Individual Defendants' own admission, they had access to information that belied Defendants' claims that Horizon's internal control systems were efficient and adhered to the

criteria set forth in the COSO Framework.

**G.  The Sharp Divergence Between Class Period Reassurances And Later Revelations Bolsters Scienter**

135.    Throughout the Class Period, Defendants assured investors that Horizon adhered to the standards of the COSO Framework and that the Company's internal control was unimpeachable.

136.    In reality, Horizon's internal control was replete with material weaknesses due to Defendants' refusal to upgrade Horizon's financial accounting software, properly staff its financial and accounting departments, properly train its staff, and properly address known deficiencies.

137.    In Horizon's 2022 10-K, Defendants admitted that, in order to remedy the material weaknesses within the Company's internal control systems, Horizon needed to institute the following measures:

- Hiring additional resources within our accounting and finance department for financial statement preparation and review and providing additional training to implement and monitor our policies and procedures;

- Enhancing controls with additional procedures for the preparation of financial statement disclosures including the design and implementation of new financial preparation tools to allow more detailed review and documentation for review and procedures relating to the reporting, classification and disclosure of loans, investments and individual cash flow line items in the Company's financial statements and the calculation of public float for purposes of determining SEC filing deadlines; and

- Developing enhanced documentation and review procedures for financial statement preparation and disclosures, including enhancing the financial statement review process by including additional steps in the review process with respect to the reporting, classification and disclosure of loans, investments and individual cash flow line items in its financial statements and the calculation of the Company's public float for purposes of determining SEC filing deadlines.

138.    The significant measures needed to be taken by the Company in order to remedy

the material weaknesses in its internal control systems, contrasted with the rosy picture painted by Defendants during the Class Period, make it inconceivable that Defendants would not know, or did not recklessly disregard, that their internal control systems were defective during the Class Period and as a result, their misleading statements throughout the Class Period misled investors.

### H.    The Temporal Proximity Between Defendants' Misleading Statements And The Disclosure of the Truth Bolsters Scienter

139.    The temporal proximity between Defendants' misleading statements and the disclosures in early 2023 about the systemic and prevalent deficiencies in Horizon's internal control systems further supports scienter.

140.    As late as November 2022, Defendants were reassuring investors that Horizon's internal control systems were efficient and adhered to the criteria set out in the COSO Framework. Less than three months later, Defendants were admitting to multiple material weaknesses within the Company's internal control systems and outlining a three-pronged overhaul of Horizon's infrastructure, hiring, and training to remedy these material weaknesses.

### I.    That Defendants' Misrepresentations Involved Horizon's Core Operations Bolsters Scienter

141.    Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned Horizon's core operation: generating margin between interest received and interest paid.

142.    Horizon's 2022 10-K explicitly stated that "[Horizon's] results of operations depend substantially on our net interest income, which is the difference between the interest income that we earn on our interest-earning assets and the interest expense that we pay on our interest bearing liabilities."  The 2022 10-K goes on to say that "[t]he largest component of [Horizon's] income is net interest income."

143.    Therefore, it would be absurd to infer that Horizon's most senior executives were unaware that it was necessary to use effective controls to calculate those numbers or to certify its financial statements to investors without having assured such controls were in place.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Horizon securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

145.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Horizon securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are several hundred or potentially more than a thousand members in the proposed Class.   Horizon's most recent Form 10-K indicates that it has "approximately 1,459" holders of record.    Record owners and other members of the Class may be identified from records maintained by Horizon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.    Plaintiff has no interests antagonistic to or in conflict with those of the Class.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.    Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Horizon;

- whether the Individual Defendants caused Horizon to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Horizon securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

149.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.    There will be no difficulty in the management of this action as a class action.

150.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Horizon securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Horizon securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

151.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

152.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

153.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

154.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

155.    During the Class Period, Defendants omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material affirmative misrepresentations, *inter alia*, (i) concealing the fact that that Horizon maintained defective internal accounting and financial reporting control relating to,

and had material weaknesses over, its reporting, classification, and disclosure of loans, investments, and individual cash flow line items in its financial statements; (b) concealing the fact that that Horizon's financial reporting relied on an understaffed finance department and manual processes involving Excel spreadsheets and antiquated software, which were known to be error-prone; (c) concealing the fact that Horizon's internal control over financial reporting was not effective; (d) concealing the fact that Horizon's internal control over financial reporting did not adhere to the standards set by the COSO Framework; (e) as a result, Horizon did not "fairly present in all material respects the financial condition, results of operations, and cash flows" of the Company as Horizon's filings claimed; and (f) concealing the fact that the material weaknesses in Horizon's internal control systems caused the numbers in the Company's filings to be unreliable and false. Such misrepresentations were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Horizon securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Horizon securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

156.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, that were designed to influence the market for Horizon securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Horizon's finances and business prospects.

157.    By virtue of their positions at Horizon, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

158.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Horizon, the Individual Defendants had knowledge of the details of Horizon's internal affairs.

159.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their control and authority over Horizon, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Horizon. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Horizon's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Horizon securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Horizon's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Horizon securities at artificially

inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

160.    During the Class Period, Horizon securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Horizon securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Horizon securities was substantially lower than the prices paid by Plaintiff and the  other members of the Class.  The market price of Horizon securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

161.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

162.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>**COUNT II**</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

163.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

164.    During the Class Period, the Individual Defendants participated in the operation and management of Horizon, and conducted and participated, directly and indirectly, in the conduct of Horizon's business affairs.  Because of their senior positions, they knew the adverse non-public information about Horizon's misstatement of income and expenses and false financial statements.

165.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Horizon's financial condition and results of operations, and to correct promptly any public statements issued by Horizon which had become materially false or misleading.

166.    Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Horizon disseminated in the marketplace during the Class Period concerning Horizon's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Horizon to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Horizon within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Horizon securities.

167.    Each of the Individual Defendants, therefore, acted as a controlling person of Horizon.  By reason of their senior management positions and/or being directors of Horizon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

Horizon to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Horizon and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

168. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Horizon.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 22, 2023

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Christopher P.T. Tourek*

Joshua B. Silverman
(admitted *pro hac vice*)
Christopher P.T. Tourek
(admitted *pro hac vice*)
10 South LaSalle Street, Suite 3505

51

Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com

*Counsel for Chad Key and*
*Lead Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East Suite
600 Los Angeles, CA 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorney for Plaintiff*